**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

NANCY SCHMITZ,

          Plaintiff,

vs.

UPPER DES MOINES
OPPORTUNITY, INC.,

          Defendant.

No. C08-4087-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

————————————

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *B. UDMO's Motion For Partial Summary Judgment* . . . . . . . . . . . . . . 11
       *1. Plaintiff Schmitz's § 1983 claims* . . . . . . . . . . . . . . . . . . 11
       *2. Plaintiff Schmitz's state whistleblower claim* . . . . . . . . . . 23
       *3. Supplemental jurisdiction* . . . . . . . . . . . . . . . . . . . . . . 25

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

This case arises from defendant Upper Des Moines Opportunity, Inc.'s ("UDMO") termination of plaintiff Nancy Schmitz's employment. Plaintiff Schmitz has brought suit under 42 U.S.C. § 1983 alleging that defendant UDMO violated her First Amendment and due process rights, as well as supplemental claims under Iowa's whistleblower statute, Iowa Code §70A.29 and Iowa common law. Defendant UDMO seeks summary judgment on plaintiff Schmitz's federal claims on the ground that it was not acting under color of state law when it terminated her. Similarly, defendant UDMO seeks summary judgment on plaintiff Schmitz's Iowa whistleblower statute on the ground that it is not a political subdivision of the State of Iowa, and therefore not covered by that statute. Finally, defendant UDMO requests that the court decline to exercise supplemental jurisdiction over plaintiff Schmitz's remaining Iowa common law claim and dismiss it.

## I. INTRODUCTION AND BACKGROUND

### A. Factual Background

The summary judgment record reveals that the following facts are undisputed.

Defendant Upper Des Moines Opportunity, Inc. is a nonprofit corporation that was incorporated under the laws of the State of Iowa in 1965. In 1967, UDMO received a determination letter from the Internal Revenue Service declaring UDMO to be a tax-empt organization under § 501(c)(3) of the Internal Revenue Code.

UDMO's Articles of Incorporation state that its purpose is

> [T]o develop programs to help urban and rural communities to mobilize their resources to combat poverty and to effect a permanent increase in the capacity of individuals, groups, and communities afflicted by poverty to deal effectively with their own problems so that they need no further assistance.

UDMO's Articles of Incorporation, Article II, Defendant's App. at 19. UDMO's preamble to its bylaws describes UDMO's purpose as follows:

> Upper Des Moines Opportunity, Inc. (UDMO) is dedicated to the provision of services to law-income individuals and families with the goal of removing barriers to poverty and empowering them to become self-sufficient. Services provided by UDMO include, but are not limited to Outreach, Health and Nutrition, Preschool Programs, Child Care Resource and Referral, Energy, Affordable Housing, and Advocacy. UDMO will strive to coordinate service provision with other community based organizations, local governments, and communities to maximize the effectiveness of services offered.

UDMO's Bylaws, Preamble, Defendant's App. at 53.

In 2006, UDMO was a community action agency serving the Iowa counties of Buena Vista, Clay, Dickinson, Emmet, Hamilton, Humboldt, O'Brien, Osceola, Palo Alto, Pocahontas, Webster and Wright. In 2006, UDMO was governed by an 18-member board of directors under a tripartite representation system required for community action agencies in which the board of directors is composed of one third public officials, one third representing program participants, and one third representing business or other private community interests.[1]

In October 2006, UDMO's board of directors were:

| Public Officials | Client Representatives | Representatives of Community Interests or Groups |
|---|---|---|
| Jake Moermond (O'Brien County Supervisor) | Kellie Jones | Jack Ryan |

---

[1] One of the 18 seats on UDMO's board of directors was vacant in 2006.

| | | |
|---|---|---|
| Derrick Petersen (Osceola County Supervisor) | Pastor Paul Wiegman | Jane McCormick |
| Ron Graettinger (Palto Alto County Supervisor) | Connie Herpst | Ryan Christenson |
| Lorna Burnside (Buena Vista County Supervisor) | Denise Fortune | Barb Rohwer (O'Brien County Auditor) |
| Romaine Lee (Humboldt County Supervisor) | Rev. Mary Green | |
| Floyd Magnusson (Webster County Supervisor) | Tina Bugay | |
| | Lindsay Perez | |

In 2006, UDMO administered several programs aimed at alleviating the conditions and causes of poverty, including, but not limited to the following: Head Start and Early Head Start; Child Care Resource and Referral; the Child and Adult Care Food Program; Women, Infants, and Children; Maternal and Child Health and the Dental Sealant Program; Title XIX; Family Development and Self-Sufficiency; the Low Income Home Energy Assistance Program; and, the Weatherization Program.

UDMO's total funding for fiscal year 2006 was $12,665,574, with approximately 80 percent ($10,075,784) of that funding coming from federal resources, 12 percent from the State of Iowa, 5 percent from private resources; and 4 percent from local public sources. In 2006, the only funds UDMO received directly from the federal government were funds for Head Start/Early Head Start, the Rural Health Program, and the Fatherhood Program. The remaining funds UDMO received from federal agencies came as subgrants from the State of Iowa. When UDMO, as a community action agency, receives funds

directly from the federal government for Head Start, it is required, pursuant to federal and state statutes and regulations, to make certain certifications and assurances.

In none of the documents UDMO submits to the federal government to receive a grant does UDMO agree to comply with the United States Constitution. As a subgrantee receipient of federal funds, UDMO is subject to OMB Circulars A-110, *Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations*, and A-133, Audits of States, Local Governments, and Non-Profit Organizations. None of these circulars requires UDMO to comply with the United States Constitution. When UDMO receives funds from the State of Iowa, either through pass-through funds from federal agencies or funds from state agencies, it signs a contract with the state agency distributing the funds. The contracts with state agencies generally contain promises to comply with various statutes, regulations, and executive orders. However, in none of the contracts UDMO has entered into with an Iowa state agency, has it agreed to comply with the United States Constitution.

In 1982, USDO applied to participate in the Iowa Public Employees' Retirement System ("IPERS"). In November 1982, the Iowa Department of Job Service determined that coverage could be granted UDMO employees for IPERS. In the Iowa Department of Job Service's letter to UDMO informing it of the department's determination, the department pointed out:

> However, as with other community action agencies that are instrumentalities of political subdivisions, only the employees who are administering the programs are covered and then only if such employees elect coverage by filing an application with the Ipers office to be covered.

Iowa Department of Job Service Letter, Defendant's App. at 103. UDMO follows the provisions of Iowa Code Chapter 21-the Iowa Open Meetings Law.[2]

On June 1, 2006, plaintiff Nancy Schmitz began serving as UDMO's Executive Director. During her employment at UDMO, certain benefits were available to UDMO employees, including private health, dental, life and long-term disability insurance, and the opportunity to participate in IPERS. As part of the compensation she received as an UDMO employee, plaintiff Schmitz elected to enroll in IPERS. UDMO terminated plaintiff Schmitz on October 19, 2006. UDMO's Executive Board conveyed UDMO's termination decision on October 19, 2006. UDMO's Executive Board members were Barb Rohwer, Romaine Lee, Ron Graettinger, Jake Moermond, and Lorna Burnside. On November 1, 2006, the UDMO's full Board of Directors ratified the Executive Board's termination of plaintiff Schmitz.

## B. *Procedural Background*

On October 17, 2008, plaintiff Nancy Schmitz filed her complaint in this case against her former employer, defendant UDMO. In her complaint, plaintiff Schmitz alleges that she was unlawfully terminated by defendant UDMO and asserts the following four causes of action: (1) a claim under 42 U.S.C. § 1983 that her termination was in retaliation for her engaging in conduct protected by the First Amendment; (2) a claim under 42 U.S.C. § 1983 that the circumstances of her termination violated the Fourth Amendment's Due Process Clause; (3) that her termination violated Iowa's whistleblower

---

[2]The parties dispute whether UDMO's compliance with Iowa's Open Meetings Law is voluntary or mandatory.

statue, IOWA CODE § 70A.29, and (4) an Iowa common law claim that her termination was in violation of public policy.

Defendant UDMO has filed a motion for partial summary judgment on three of plaintiff Schmitz's claims. In its motion, defendant UDMO asserts that it is not a state actor for the purposes of plaintiff Schmitz's § 1983 claims and that it is not a "political subdivision" of Iowa, an essential element of plaintiff Schmitz's claim under Iowa's whistleblower statute. Plaintiff Schmitz has filed a timely resistance to defendant UDMO's motion for partial summary judgment, contesting each of the grounds for summary judgment put forward by defendant UDMO. Defendant UDMO has filed a timely reply brief.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving

party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing

law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v.*

*County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).  Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law.  If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law."  *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910.  Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts.  *Matsushita*, 475 U.S. at 587-88.  However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses."  *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).  Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine."  *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law.  *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law.").  Thus, the relevant law concerning plaintiff's claims is pivotal.  *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates

the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996). Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against partial summary judgment.

## B. UDMO's Motion For Partial Summary Judgment

### 1. Plaintiff Schmitz's § 1983 claims

Section 1983 authorizes a federal cause of action against persons who, while acting under color of state law, cause a violation of a plaintiff's federal rights. 42 U.S.C. § 1983. In order to state a claim for relief under 42 U.S.C. § 1983, plaintiff Schmitz must establish that she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Carlson v. Roetzel & Andress*, 552 F.3d 648, 650 (8th cir. 2008); *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005); *Kuha v. City of Minnetonka*, 365 F.3d 590, 606 (8th Cir. 2003); *Dennen v. City of Duluth*, 350 F.3d 786, 790 (8th Cir. 2003); *Murray v. City of Onawa*, 323 F.3d 616, 618 (8th Cir. 2003); *Hott v. Hennepin County, Minn.*, 260 F.3d 901, 905 (8th Cir. 2001);

*Shrum v. Kluck*, 249 F.3d 773 (8th Cir. 2001). Courts have consistently treated the "under color of state law" element of § 1983 "as the same thing as the 'state action' required under the Fourteenth Amendment." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 ( 1982) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)); *accord Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001); *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982); *Dossett*, 399 F.3d at 947; *Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 229 (2nd Cir. 2004); *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir.), *cert. denied sub nom. Oregon Arena Corp v. Lee*, 536 U.S. 905 (2002); *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir.), *cert. denied*, 534 U.S. 952 (2001); *Tarpley v. Keistler*, 188 F.3d 788, 791 (7th Cir. 1999); *Abraham v. Raso*, 183 F.3d 279, 287 (3rd Cir. 1999); *Yeo v. Town of Lexington*, 131 F.3d 241, 248 n.3 (1st Cir. 1997), *cert. denied*, 524 U.S. 904 (1998); *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995). "[S]tate action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and that 'the party charged with the deprivation must be a person who may fairly said to be a state actor.'" *Sullivan*, 526 U.S. at 50 (quoting *Lugar*, 457 U.S. at 937); *see Carlson*, 552 F.3d at 651; *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007). Careful attention to the state action requirement serves two purposes: it "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power," *Lugar*, 457 U.S. at 936; and it avoids imposing on a state responsibility for conduct which was not under its control. *Brentwood Acad.*, 531 U.S. at 295. Thus, as a consequence, a central issue raised by defendant UDMO's motion for partial summary judgment is whether it was a state actor or was acting under color of state law when it terminated Schmitz's

employment. Deciding whether there is state action in a particular case turns on the particular facts of a case. *See Wickersham*, 481 F.3d at 597. "'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'" *Id.* (quoting *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722 (1961)); *see McVarnish v. Mid-Nebraska Cmty. Mental Health Ctr.*, 696 F.2d 69, 71 (8th Cir. 1982). Federal courts have recognized the inherent difficulty in determining whether a private entity has acted under the color of state law, with the Seventh Circuit Court of Appeals recently acknowledging that, "this determination constitutes "'one of the more slippery and troublesome areas of civil rights litigation.'" *Rodriguez v. Plymouth Ambulance Serv.*, --F.3d--, 2009 WL 2498580, at *4 (7th Cir. Aug. 18, 2009) (quoting *Int'l Soc'y for Krishna Consciousness v. Air Canada,* 727 F.2d 253, 255 (2d Cir. 1984) (quotation marks omitted)).

In *Brentwood Acad.*, the United States Supreme Court clarified the test for "state action" as it had developed through *National Collegiate Athletic Assn. v. Tarkanian*, 488 U.S. 179 (1988), *Blum v. Yaretsky*, 457 U.S. 991 (1982), *Lugar*, 457 U.S. 922, and *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982). The Court instructed that the acts of a private party are "fairly attributable to the State" so as to be deemed under "color of state law" for § 1983 purposes "if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad.*, 531 U.S. at 295 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). The Supreme Court noted that the criteria for determining whether state action is present "lack rigid simplicity," but the Court identified the following factors that bear on the question:

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of

> "coercive power," [*Blum v. Yaretsky*, 457 U.S. 991, 1004, 102
> S. Ct. 2777, 73 L. Ed.2d 534 (1982) ], when the State
> provides "significant encouragement, either overt or covert,"
> *ibid.*, or when a private actor operates as a "willful participant
> in joint activity with the State or its agents," [*Lugar v.
> Edmondson Oil Co.*, 457 U.S. 922, 941, 102 S. Ct. 2744, 73
> L. Ed. 2d 482 (1982) ] (Internal quotation marks omitted).
> We have treated a nominally private entity as a state actor
> when it is controlled by an "agency of the State," *Pennsylvania
> v. Board of Directors of City Trusts of Philadelphia*, 353 U.S.
> 230, 231, 77 S. Ct. 806, 1 L. Ed.2d 792 (1957) (per curiam),
> when it has been delegated a public function by the State, cf.,
> e.g., [*West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 101
> L. Ed. 2d 40 (1988) ]; *Edmonson v. Leesville Concrete Co.*,
> 500 U.S. 614, 627-628, 111 S. Ct. 2077, 114 L. Ed.2d 660
> (1991), when it is "entwined with governmental policies," or
> when government is "entwined in [its] management or
> control," *Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S. Ct.
> 486, 15 L. Ed. 2d 373 (1966).

*Brentwood Acad.*, 531 U.S. at 296.

In the *Brentwood Acad.* decision, the Court concluded that pervasive entwinement of public institutions and public officials in the composition and actions of a high school interscholastic athletic association signified that regulatory actions by the nominally private association were taken under color of state law. *Id.* at 298. The Court acknowledged that the analysis of whether state action existed was a "necessarily fact-bound inquiry," *id.* (quotation marks omitted), and noted that public schools constituted 84 percent of the association's membership and school faculty and administrators provided the association's leadership. Id. at 298. The Court was also influenced by the fact that the association's primary revenue source was gate receipts from tournaments between teams from association member schools. *Id.* at 299. The Court concluded that:

to the extent of 84% of its membership, the Association is an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling. There would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms.

*Id*. at 299-300.

The controlling issue here concerning plaintiff Schmitz's § 1983 claims is the question of whether UDMO is a "state actor." The court concludes that it is not. This case does not involve sufficient "entwinement" to meet *Brentwood*'s "pervasive entwinement" test. UDMO is a non-profit corporation whose board of directors is composed of both private individuals and public officials drawn from the twelve counties in its service area. Although Schmitz points out that UDMO is a community action agency organized and regulated pursuant to Iowa law, the Supreme Court, however, has held that "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State.'" *Sullivan*, 526 U.S. at 52 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974)); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998) (holding that organization running head start program was not acting under color of law even if the court assumed it was extensively regulated by the state). Schmitz's argument in favor of a finding of state action also focuses on the fact that UDMO receives significant public funds. The Supreme Court, however, has cautioned that a predominance of public funding is not conclusive evidence of state action. *See Rendell-Baker v. Kohn*, 457 U.S. at 831; *see also Blum*, 457 U.S. 991, 1011 (holding no state action even though state paid the medical expenses of more than 90 percent of the patients and subsidized the operating and capital costs of the nursing

homes); *McVarnish*, 696 F.2d at 71 (recognizing that "[s]tate action is not necessarily present merely because an entity is funded, even wholly funded, by the state."). In *Rendell-Baker*, 457 U.S. at 831, a privately operated school for students with disciplinary problems was sued by several former employees over the circumstances of their terminations. Most of the school's students had their tuition paid by public school districts, and the school also received aid from various federal and state education agencies. As a result, for several years public funds accounted for between 90 and 98 percent of the school's operating budget. Thus, public entities were by far the school's largest customer and source of funds. *Id.* The Court, however, held that the school was not a state actor, at least for the purposes of the petitioners' claims. The decisive factor in the Court's view was that the school's personnel decisions were uninfluenced by public officials and that "the decisions to discharge the petitioners were not compelled or even influenced by any state regulation." *Id.* at 841. In light of the autonomy with which it made its decisions as to whom to hire and fire, the school was not "fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.* at 840-41. Thus, the Court has clearly indicated that public funding and extensive regulation without more are insufficient to establish state involvement in the actions of a private party. *Id.* at 842-43.

Plaintiff Schmitz points to the fact that the members of the UDMO's Executive Board were public officials and argue that since one third of the UDMO's Board of Directors is comprised of county officials and the UDMO's Board of Directors ratified the UDMO Executive Board's decision to terminate Schmitz, state officials had a direct involvement in the decision to terminate Schmitz's employment. This link between the

decision to terminate Schmitz and county officials sitting on UDMO's Board of Directors and Executive Board is too attenuated to support a finding of state action because none of the county officials were acting in their official capacities as public officials when they voted to terminate Schmitz. *See West v. Atkins,* 487 U.S. 42, 50 (1988) ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). Moreover, only one-third of UDMO's Board of Directors is made up of individuals holding public office. Thus, because public officeholders make up only a minority presence on UDMO's Board of Directors, they are not in a position to control UDMO's actions. *See Lansing v. City of Memphis*, 202 F.3d 821, 831 (6th Cir. 2000) ("The minority presence of public officials on the board of a private entity does not render the entity a state actor. . ."); *Crowder*, 740 F.2d 447 (holding that private hospital's action in restricting physician's staff privileges was not state action even though two of the thirteen board members were public officials). Finally, no evidence exists in the summary judgment record before the court that UDMO's decision to terminate Schmitz was "compelled or even influenced by any State regulation." *Rendell-Baker,* 457 U.S. at 841.

In *Dowe*, 145 F.3d 653 and *Nail v. Community Action Agency of Calhoun County,* 805 F.2d 1500 (11th Cir. 1986) (per curiam), both the Fourth and Eleventh Circuit Courts of Appeals were confronted with nearly identical issues which are currently before this court. In both *Dowe* and *Nail*, a terminated employee of a Head Start Program, which was the recipient of both federal and state funding, brought suit under § 1983. *Dowe*, 145 F.3d at 658; *Nail*, 805 F.2d at 1501. In each case, the Fourth and Eleventh Circuit Courts of Appeals concluded that because the personnel decision was not controlled by state regulations or involvement, the Head Start program could not be found to be a state actor. *Dowe*, 145 F.3d at 659-60; *Nail*, 805 F.2d at 1501-02; *see also Moglia v. Sullivan Co.*

*Head Start*, 988 F. Supp. 366, 367 (S.D.N.Y.1997) (holding that county Head Start program was not acting under color of law in discharging plaintiff); *Joseph v. Ulster County Cmty. Action Comm., Inc.*, 475 F. Supp. 944, 947-48 (S.D.N.Y. 1979) (finding county community action commission, which supervised the local Head Start program, was not a state actor). Similarly, in *Morse v. North Coast Opportunities, Inc.*, 118 F.3d 1338 (9th Cir. 1997), the Ninth Circuit Court of Appeals held that a Head Start parents' council's approval of an employee's termination was not fairly attributable to the federal government.[3] *See id.* at 1342-43. Although acknowledging that the federal government both funded and regulated the Head Start program, the Ninth Circuit Court of Appeals held that governmental funding and extensive regulation, without more, were insufficient to establish that the private agency's actions were fairly attributable to the federal government. *See id.* at 1343.

Plaintiff Schmitz further argues that UDMO is a state actor because, by coordinating anti-poverty programs, it fulfills a function that is "'traditionally the exclusive prerogative of the State.'" *Blum,* 457 U.S. at 1005 (quoting *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 353 (1974)). The conduct of private parties may also be deemed state action if such conduct is "traditionally the exclusive prerogative of the State." *Jackson,* 419 U.S. at 353, *see Blum,* 457 U.S. at 1004-05. The running of elections, *Terry v. Adams,* 345 U.S. 461, (1953), a municipal park, *Evans v. Newton,* 382 U.S. 296 (1966), the operating of a town

_____

[3]Although the complaint in *Morse* stated that the claims were brought under § 1983, because only federal action was alleged, the court of appeals assumed that the claim could have been brought under *Bivens v. Six Unknown Agents,* 403 U.S. 388 (1971), rather than § 1983, but proceeded to analyze the claims under the standard applicable to state action under § 1983 because "the standard for determining the existence of federal government action can be no broader than the standard applicable to State action under § 1983." *Morse*, 118 F.3d at 1342.

by a company, *Marsh v. Alabama,* 326 U.S. 501 (1946), and the providing of medical services to prison inmates, *West,* 487 U.S. 42, are examples of functions exclusive to the State. The Supreme Court has stressed the limited nature of those public functions which will meet this standard, observing that: "The fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action'." *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 544 (1987) (quoting *Rendell-Baker,* 457 U.S. at 842). The restrictive nature of qualifying public functions is exemplified by the Court's decision in *Jackson,* 419 U.S. 345. There, the plaintiff, a customer, brought suit against an energy utility company for terminating her electrical service without prior notice or hearing. *Id.* at 346-348. The defendant energy utility company, while a private company, held a certificate of public convenience issued by a state utility commission, which empowered it to deliver electricity to the service area where the plaintiff lived. *Id.* at 346. In rejecting plaintiff's assertion of state action, the court observed:

> Petitioner . . . urges that state action is present because respondent provides an essential public service required to be supplied on a reasonably continuous basis by [a Pennsylvania state statute], and hence performs a "public function." . . . If we were dealing with the exercise by [respondent] of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. . .
>
> . . .
>
> Doctors, optometrists, lawyers, [respondent], and Nebbia's upstate New York grocery selling a quart of milk are all in regulated businesses, providing arguably essential goods and services, "affected with a public interest." We do not believe that such a status converts their every action, absent more, into that of the State.

*Id.* at 352-54 (citations omitted). In addition to the operation of a utility company, the Court has not found a qualifying exclusive public function in cases involving the providing of workers' compensation benefits, *Sullivan,* 526 U.S. 40, providing state funded nursing home care to Medicaid patients, *Blum,* 457 U.S. 991, and the running of a private school, *Rendell-Baker,* 457 U.S. 830. As the Court has instructed: "The range of government activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions." *Evans,* 382 U.S. at 300.

Plaintiff Schmitz has not established that UDMO provides a function that is "'traditionally the exclusive prerogative of the State.'" *Blum,* 457 U.S. at 1005. UDMO operates a regulated Head Start Program, as well as coordinating welfare services such as the Child and Adult Care Food Program; Women, Infants, and Children; Title XIX; and the Low Income Home Energy Assistance Program. Although such anti-poverty measures are of clear importance to society, anti-poverty actions cannot be considered to be the exclusive domain of the State. A great many private charitable and religious organizations- such as the United Way, the Salvation Army, Catholic Charities, America's Second Harvest, and Meals on Wheels, to name but a few-have undertaken a wide variety of anti-poverty measures throughout the United States. Consequently, it cannot fairly be said that UDMO has been delegated a traditional, exclusive governmental function. *See Archer v. Economic Opportunity Comm'n of Nassau County Inc.*, 30 F. Supp.2d 600, 606 (E.D.N.Y. 1998) (holding that programs offered by private, not-for-profit anti-poverty organization, which operated a Head Start program, provided education and welfare services, and acted as "a liaison for clients to the federal and state social security and disability agencies," were "not within the exclusive province of the State.").

Plaintiff Schmitz also asserts that defendant UDMO is a state actor based on its joint action with the state. UDMO contends that Schmitz's argument for joint action is precluded by the express limitation on the holding in *Lugar,* 457 U.S. at 932-33. In *Lugar*, the Supreme Court explicitly held that the conduct of private parties undertaken pursuant to prejudgment attachment procedures can be ascribed to the State "whenever officers of the State act jointly with a creditor in securing the property in dispute." *Id*. The defendant in *Lugar* was a creditor who took advantage of a state-created procedure to obtain a prejudgment attachment for some of plaintiff's property. *Id*. at 924-25. The Court held that "[w]hatever may be true in other contexts, . . . when the State has created a system whereby state officials will attach property on the *ex parte* application of one party to a private dispute," a finding of "joint participation" does not require anything "more than invoking the aid of state officials to take advantage of state-created attachment procedures." *Id*. at 942. The Court in *Lugar*, however, carefully limited its holding to the context of prejudgment attachments, "[t]he holding today, as the above analysis makes clear, is limited to the particular context of prejudgment attachment." *Id*. In doing so, the court specifically rejected the notion that "'a private party's mere invocation of state legal procedures constitutes "joint participation" or "conspiracy" with state officials satisfying the § 1983 requirement of action under color of law.'" *Id*. at 939 n. 21 (quoting *Lugar,* 457 U.S. at 951 (Powell, J., dissenting)). The Eighth Circuit Court of Appeals recognized *Lugar's* limited holding, most recently in *Carson v. Roetzel & Andress*, 522 F.3d 648, 650 (8th Cir. 2008). There is no allegation in this case that UDMO sought prejudgment attachment of any of Schmitz's property. Thus, the court finds that the joint action rule applied in *Lugar* is inapplicable in this case since there is no allegation of prejudgment attachment.

This conclusion, however, does not end the court's analysis for, as plaintiff Schmitz argues, the Eighth Circuit Court of Appeals has recognized a separate joint action theory based on the Supreme Court's decision in *Adickes v. S. H. Kress Co.*, 398 U.S. 144 (1970). *See Wickersham*, 481 F.3d at 597; *Dossett*, 399 F.3d at 951-52. In *Adickes*, the plaintiff sued a private restaurant under § 1983, alleging a conspiracy between a restaurant and the local police to deprive her of the right to equal protection. *Id.* at 152. In upholding the cause of action, the Court found that the private defendant, in "conspiring" with the local police engaged in a "'joint activity with the State or its agents'"and therefore acted under color of law within the meaning of § 1983. *Id.* at 152 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Thus, "a private actor can be liable 'under § 1983 for conspiring with state officials to violate a private citizen's right[s]. . . .'" *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) (quoting Dossett, 399 F.3d at 950). "The key inquiry is whether the private party was a willful participant in the corrupt conspiracy." *White*, 519 F.3d at 816; *accord DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999); *see Dossett*, 399 F.3d at 950 ("We see no reason why a private actor may not be liable under § 1983 for conspiring with state officials to violate a private citizen's right to freedom of speech under the First Amendment, just as it may be held liable for conspiring to violate other constitutional rights."). Here, no conspiracy is alleged between UDMO and a state actor acting in his or her official capacity. Instead, plaintiff Schmitz merely points to the fact that some members of UDMO's board of directors are also elected county officials. Such involvement is plainly insufficient to constitute joint activity with the State or its agents. Therefore, the court concludes that UDMO was not acting under color of state law when it terminated plaintiff Schmitz. Accordingly, the court grants defendant UDMO's motion for partial summary judgment with respect to plaintiff Schmitz's federal claims.

### 2. *Plaintiff Schmitz's state whistleblower claim*

Defendant UDMO also seeks summary judgment on plaintiff Schmitz's claim under Iowa Code § 70A.29, Iowa's whistleblower statute. Defendant UDMO contends that plaintiff Schmitz's claim fails because she was not employed by a political subdivision of the State of Iowa, a prerequisite for bringing a claim under the Iowa whistleblower statute.

Iowa Code § 70A.29 provides in pertinent part:

> 1. A person shall not discharge an employee from or take or fail to take action regarding an employee's appointment or proposed appointment to, promotion or proposed promotion to, or any advantage in, a position in employment ***by a political subdivision of this state*** as a reprisal for a disclosure of any information by that employee to a member or employee of the general assembly, or an official of that political subdivision or a state official or for a disclosure of information to any other public official or law enforcement agency if the employee reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety. This section does not apply if the disclosure of the information is prohibited by statute.

IOWA CODE § 70A.29(1).

The legislative history indicates the purpose of the statute is "to protect public employees from personnel actions as reprisals for providing information to legislators or public officials or disclosing waste, mismanagement, or violations of law." *Id.*, *Historical & Statutory Notes*. The plain language of Iowa's whistleblower statute states that the protected position of employment must be "by a political subdivision of the state. . ." *Id.*; *see Smuck v. National Mgmt. Corp.*, 540 N.W.2d 669, 672 (Iowa Ct. App. 1995) (observing that plaintiff's claim was "not within the reach of Iowa's whistleblower statute" where plaintiff was employed by a "private employer" and had not reported violations of

law to law enforcement officials). Although the term "political subdivision" is not defined in Iowa Code Ch. 70A, it is defined in a number of other locations within the Iowa Code. In Iowa Code § 23A.1(1), pertaining to noncompetition by government, the term is defined as follows: "'*Political subdivision*' means a city, county, or school corporation." The term is similarly defined in Iowa Code § 25B.3(1), concerning state mandates, to mean: "a city, county, township, or school district." Likewise Iowa's smoke free air act, Iowa Code Ch. 142D, defines "political subdivision" to mean "a city, county, township, or school district." IOWA CODE § 142D.2(14). A near identical definition is contained in Iowa Code Chapter 145A, pertaining to area hospitals, defining "political subdivision" to mean "any county, township, school district or city." IOWA CODE § 145A.2(5). Similarly, the term "political subdivision is defined in the Iowa Code Chapter governing mines, Iowa Code Ch. 208, to mean: "any county, district, city, or other public agency within the state of Iowa." IOWA CODE § 208.2(14). UDMO would not qualify as a political subdivision under any of these definitions. Clearly, in 1985 when the Iowa Legislature enacted Iowa's whistleblower statute, it was aware that the term "political subdivision" had been so defined but opted not to include a broader definition within the statute. Accordingly, the court concludes that UDMO, as a nonprofit corporation, does not constitute a political subdivision under Iowa Code § 70A.29. *See* 1980 Iowa Op. Atty. Gen. 699. 1980 WL 25977, at *2 ("A community action agency, which is a private nonprofit corporation, is not the State of Iowa, the United States, or a political subdivision.") (citing 1976 Iowa Op. Att'y Gen. 823). Therefore, the court grants defendant UDMO's motion for partial summary judgment with respect to plaintiff Schmitz's Iowa whistleblower claim.

### *3.     Supplemental jurisdiction*

Defendant UDMO requests that the court dismiss plaintiff Schmitz's remaining Iowa common law claim, for termination in violation of public policy, pursuant to 28 U.S.C. § 1367(c)(3), which permits a federal district court to decline to exercise supplemental jurisdiction where all the claims over which the district court had original jurisdiction have been dismissed.  Under 28 U.S.C. § 1367, a federal district court "may decline to exercise supplemental jurisdiction" if-

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  This subsection gives a court the discretion to reject jurisdiction over supplemental claims, "but only to a point."  *McLaurin v. Prater*, 30 F.3d 982, 985 (8th Cir. 1994). "The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."  *Id*.  Thus, where the case clearly fits within one of the subsections listed above, the court may decline to exercise supplemental jurisdiction.  *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1287 (8th Cir. 1998); *McLaurin*, 30 F.3d at 985; *Packett v. Stenberg*, 969 F.2d 721, 726-27 (8th Cir. 1992).

Here, UDMO's argument is grounded on the first and third categories, 28 U.S.C. §§ 1367(c)(1) and (c)(3).  When determining whether a court should exercise supplemental jurisdiction, courts must balance the interests of judicial economy, convenience, fairness, and comity. *See Quinn v. Ocwen Federal Bank FSB,* 470 F.3d 1240, 1249 (8th Cir. 2006); *Barstad v. Murray County*, 420 F.3d 880, 888 (8th Cir. 2005); *Grain Land Coop v. Kar*

*Kim Farms, Inc.,* 199 F.3d 983, 993 (8th Cir. 1999). "'In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Barstad*, 420 F.3d at 888 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

Here, the court finds that comity strongly suggests that the court should decline to exercise supplemental jurisdiction over Schmitz's state common law claim for termination in violation of public policy since the claim raises issues of first impression under Iowa law. Namely, whether Iowa would recognize any of the Iowa statutes cited in Schmitz's complaint as giving rise to clearly defined public policy protecting plaintiff's actions. Except where other factors weigh strongly in favor of exercising supplemental jurisdiction, the court believes that interpretation of a state common claim as a matter of first impression should be left to the state courts. Indeed, 28 U.S.C. § 1367(c)(1) provides, independently, that the district courts may decline to exercise supplemental jurisdiction over a claim under § 1367(a), if "the claim raises novel or complex issues of State law." *See Fielder v. Credit Acceptance Corp.,* 188 F.3d 1031, 1038 (8th Cir. 1999) ("[N]ovel, complex, and important issues of state law on which the [state] appellate courts have given us little or no prior guidance . . . are precisely the types of issues as to which federal courts should hesitate to exercise § 1367 supplemental jurisdiction."). The court, likewise, finds that fairness dictates that it should decline to exercise supplemental jurisdiction over the remaining state-law claim. *See Barstad,* 420 F.3d at 888 (considering "fairness" as a factor that will usually point to declining to exercise supplemental jurisdiction over remaining state-law claims). Because the viability of Schmitz's state common law claim depends upon the interpretation of Iowa law, it is clearly fairer to the parties for the Iowa

appellate courts, which have the ultimate say on interpretation of Iowa law, to have the first say. Nor is it unfair to the parties to relinquish Schmitz's remaining claim to state court, because this litigation was filed less than a year ago and discovery is not yet completed. In addition, what discovery has been conducted in this court will not be "lost," since the claim will arise again in state court. Moreover, Schmitz's action will not be "lost," because Iowa's "savings" or "failure of action" statute, Iowa Code § 614.10, will preserve her action. *See* Iowa Code § 614.10 ("If, after the commencement of an action, the plaintiff, for any cause except negligence in its prosecution, fails therein, and a new one is brought within six months thereafter, the second shall, for the purposes herein contemplated, be held a continuation of the first."). Finally, the court finds that judicial economy and convenience of the parties warrant declining to exercise supplemental jurisdiction over the remaining state-law claim. *See Barstad,* 420 F.3d at 888 (suggesting that both of these factors will usually point to declining to exercise supplemental jurisdiction over remaining state-law claims). Both parties are in Iowa and have access to Iowa courts, and it is more economical for the courts charged with interpreting Iowa law to pass on issues of first impression under Iowa law in the first instance. Therefore, the court will decline to exercise supplemental jurisdiction over Schmitz's remaining Iowa state common law claim for termination in violation of public policy.

## III. CONCLUSION

For the reasons stated above, defendant UDMO's Motion for Partial Summary Judgment is **granted**. Therefore, the court dismisses plaintiff Schmitz's two § 1983 claims as well as her Iowa whistleblower claim. Moreover, pursuant to 28 U.S.C. §§ 1367(a) and (c), the court declines to exercise supplemental jurisdiction over Schmitz's remaining

Iowa common law claim for termination in violation of public policy and that claim is also dismissed.  This case is dismissed in its entirety and judgment shall issue accordingly.

**IT IS SO ORDERED.**

**DATED** this 21st day of September, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA